USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 12/20/2013

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------- X
                                                        :
MARINO INSTITUTE OF CONTINUING                          :
LEGAL EDUCATION, INC.,                                  :
                                                        :   12 Civ. 4320 (KPF)
                                      Plaintiff,        :
                        v.                              :   OPINION AND ORDER
                                                        :
OMAR ISSA, *et al.*,                                    :
                                                        :
                                      Defendants.       :
                                                        :
------------------------------------------------------- X

KATHERINE POLK FAILLA, District Judge:

On June 1, 2012, Plaintiff Marino Institute of Continuing Legal Education, Inc. ("Marino" or "Plaintiff"), brought claims under New York State law, 18 U.S.C. § 1030, 17 U.S.C. § 101, and 15 U.S.C. § 1125(a) against several defendants, including Omar Issa ("Issa") and his company, Lionyx Solutions Corp. ("Lionyx") (collectively, "Defendants"). Broadly speaking, Plaintiff alleged theft and misappropriation of its continuing legal education ("CLE") programs and proprietary customer list. Plaintiff settled with all defendants but Issa and Lionyx in the first six months of 2013, and reached a resolution with these two Defendants on August 14, 2013; the resolution was transcribed contemporaneously by a court reporter, and was reported by the parties to the Court as a settlement of the case.

Defendants now assert that the parties did not enter into a final agreement on August 14, 2013, and, thus, that there was no settlement. Plaintiff, by contrast, has moved to enforce the August 14 agreement. For the reasons set forth in the remainder of this Opinion, Plaintiff's motion is granted.

**BACKGROUND**

A.   **Factual Background**[1]

    1.   **Plaintiff's Complaints and Its Settlements with Other Defendants**

Plaintiff filed its first complaint in this matter on June 1, 2012, naming as defendants Issa, Lionyx, IPLS Global ("IPLS"), MP Innovations, Inc. ("MP Innovations"), and Matt Partain ("Partain"). (Dkt. #1). The gist of the complaint was that, in or about September 2011, while working for Plaintiff, Issa conspired with the other defendants to access a computerized database containing Plaintiff's historical sales information, client lists, meeting and other CLE materials — all of which Issa then used to solicit Plaintiff's clients to participate in competing CLE programs.

Plaintiff filed an amended complaint on January 23, 2013, adding as defendants IMS Labs, LLC ("IMS"), iContact.com, Inc. ("iContact"), and Vocus, Inc. ("Vocus"), but the gist of its claims remained the same. (Dkt. #28). A second amended complaint, substantively indistinct from its predecessor, was filed on January 29, 2013 (the "Complaint"); it is the operative complaint in this action. (Dkt. #38).

---

[1]   To the extent not derived from the docket, the facts in this section are assumed true for the purposes of this Opinion, and are derived from the parties' communications with the Court between June 2013 and November 2013; the transcripts of proceedings held before the Court held on October 3, 2013 ("Oct. 3 Tr.") and November 1, 2013 ("Nov. 1 Tr."); and the materials attached to the Declaration of Dorothy M. Weber ("Weber Decl.") (Dkt. #82), and the Affidavit of Omar Issa ("Issa Aff.") (Dkt. #83). The transcript of the August 14, 2013 settlement ("Aug. 14 Tr.") was appended to Plaintiff's October 15, 2013 letter (Dkt. #73); the unexecuted long-form settlement agreement ("Long-Form Agreement"), and the partially-executed stipulation of discontinuance ("Stip. of Discontinuance") were submitted to the Court by e-mail on October 2, 2013.

In late March 2013, Plaintiff resolved its claims against iContact and Vocus, and a stipulation of dismissal was executed removing those parties from the case. (Dkt. #57, 58, 59). Three months later, in June 2013, Plaintiff resolved its claims against Partain, MP Innovations, and IMS, and a second stipulation of dismissal was executed to that effect. (Dkt. #64). With particular respect to Defendants, however, Plaintiff sought permission in April 2013 to file a motion for partial summary judgment as to Counts III, IV, and V of the Complaint, arguing that discovery had only confirmed that Defendants had misappropriated Plaintiff's customer contact list. (Dkt. #60). The Court denied permission, deeming the request to be premature and noting that the proposed motion failed to address all of the claims. (*See generally* Dkt. #60, 61).[2]

The case was reassigned to the undersigned on June 24, 2013. (Dkt. #65). The Court then ordered the parties remaining in the case, i.e., Plaintiff and Defendants, to submit a joint status letter. (Dkt. #66). The parties submitted the joint letter on August 5, 2013. (Dkt. #67). Of particular significance to the instant motion, (i) the parties related to the Court that "[b]oth parties continue settlement discussions and believe an amicable resolution can be reached"; and (ii) Plaintiff related that it was seeking more than $320,000 in compensatory damages from Defendants. (*Id.* at 4-5).

2. **The August 14, 2013 Oral Agreement**

Plaintiff, Defendants, and their respective counsel met for a settlement conference on August 14, 2013, and reached an oral agreement that day. (Pl.

---

[2]   Issa was subsequently deposed on June 7, 2013. (Pl. Oct. 15 Letter).

Oct. 15 Letter; Aug. 14 Tr.).  The agreement was transcribed by a court reporter, by phone.  (Aug. 14 Tr.).  The parties dispute the enforceability of this agreement.

The agreement reached on the record noted that "[i]t is the intention of the parties that all of the material terms of the agreement as set forth as we go on will be subject to a written long-form agreement," but that the written agreement would be "based on the material terms as agreed to today."  (Aug. 14 Tr. 4).  Joseph Marino, as representative for Plaintiff, then read the substantive terms of the agreement into the record, without contradiction from Defendants or their counsel.  These terms included provisions that, for the next three years, (i) New York, New Jersey, and Pennsylvania would become the exclusive jurisdictions for Marino CLE programs; (ii) Bridge the Gap (Issa's company) would be the exclusive outside sales agent for Plaintiff's CLE programs in those states; (iii) Bridge the Gap would not sell its own programs or any outside vendor programs in NY, NJ, and PA, except subject to pre-existing 2013 CLE dates Issa had arranged; (iv) the parties agreed that "in New York, New Jersey, and in Pennsylvania we are going to come to terms as to the sharing of revenue of the programs that we are running, as to both the live and the on-line content"; and that (v) Issa would refrain from selling to certain client e-mail addresses.  (*Id.* at 4-5).  The parties further noted that "[i]t is the intention of the parties to work out an agreement whereby those Issa courses [i.e., CLE courses that were previously-scheduled in August, September, October, November, and December 2013] will either be combined with Marino, or cross-

4

sold, and that those dates are not a breach of the exclusivity period." (*Id.* at 5). Finally, the parties agreed to file a stipulation of discontinuance with the Court, and agreed that "the long-form agreement will be negotiated, finalized, and signed in ten days or less, and Mr. Nesci [Vincent Nesci, Defendants' then-counsel] has asked that it be less than ten days." (*Id.* at 6).

On August 26, 2013, the parties jointly notified the Court by phone that they had reached a settlement. (Dkt. #68). The Court entered a 30-day Order that day, thereby closing the case. (*Id.*). Shortly thereafter, Plaintiff's counsel, Dorothy Weber, prepared a stipulation of discontinuance, which was subsequently signed and returned by Nesci. (Stip. of Discontinuance).[3]

### 3. Circulation of the Long-Form Settlement Agreement

On August 26, 2013, Plaintiff's counsel prepared a long-form settlement agreement, which — as explicitly contemplated by the parties — closely tracked the agreement reached on the record on August 14, 2013. (Pl. Sept. 25 Letter (Dkt. #69); Long-Form Agreement). Notably, the agreement also left open the ongoing business arrangement, stating: "[i]n New York, New Jersey and in Pennsylvania the Issa Defendants and Plaintiff shall negotiate and execute a commission agreement as soon as practicable." (Long-Form Agreement § 1(a)). The long-form agreement similarly left open the fall 2013 CLE arrangements, stating that with regard to those previously-scheduled CLEs, "[i]t is the intention of the Parties to work out an agreement whereby those Issa Defendants' courses will either be combined with Plaintiff's courses, or cross-

---

[3]  Nesci's signature, and the stipulation, are dated as of September 2013, but do not include an exact date.

5

sold, and that those dates are not a breach of the exclusivity provision." (*Id.*). Defendants' lawyer agreed that the Long-Form Agreement "exactly tracked" the agreement reached on August 14, 2013. (Oct. 3 Tr. 3).

Between August 14, 2013, and September 6, 2013, Issa engaged in discussions with Michael Marino in person and on the phone several times regarding their future business relationship. (Def. Oct. 29 Letter (Dkt. #79); Issa Aff. Ex. 1). The parties' attorneys decided not to involve themselves in these business discussions. (Oct. 3 Tr. 4).

In a sworn affidavit submitted to the Court in connection with this motion, Issa stated that at some point in these business negotiations with Michael Marino, they disagreed regarding an upcoming CLE program Issa had planned at Hunter College in September. (Issa Aff. ¶¶ 4-6). Michael Marino called Issa to state that they could not work out a way to combine their programs at Hunter College, and that the Marinos would not hold a CLE program at Hunter College. (*Id.* ¶ 5). However, according to Issa, the Marinos did hold a CLE program at Hunter College on the day of Issa's CLE program. (*Id.* ¶ 6). Issa "understood these actions to mean that they were not acting and negotiating in good faith." (*Id.*; Def. Oct. 29 Letter).

Plaintiff's counsel sent the settlement agreement to Defendants' counsel on September 9, 2013. (Pl. Sept. 25 Letter). Nesci forwarded it to his client around that time. Despite numerous requests from Plaintiff for the executed agreement, Nesci was unable to get in touch with Issa. Indeed, Nesci tried to contact Issa through Plaintiff. Specifically, on September 16, 2013, Nesci wrote

to Plaintiff's counsel, Dorothy Weber, to ask her to check with her client Michael Marino, "as the last I heard he and Omar were working on something — exactly what I have no idea." (Weber Decl. Ex. B). Weber replied, "Let them worry about that agreement.... let's get the settlement signed so we can get the Stipulation filed." (Weber Decl. Ex. C). When Weber followed up with Nesci on September 17, 2013, regarding the signed stipulation, Nesci wrote that he had "told [Issa] that he and Michael [Marino] must sign now and that the business deals can be done as they come up." (Weber Decl. Ex. F).

On September 25, 2013, Nesci notified Plaintiff's counsel that he could not reach Issa but that he had spoken with Issa's father. (Pl. Sept. 25 Letter). That same day, Plaintiff's counsel asked the Court to reopen the case in light of defense counsel's difficulty in reaching his clients; the Court granted Plaintiff's application and scheduled a conference in the matter for October 3, 2013. (Dkt. #69).

### B. Proceedings Before the Court

#### 1. The October 3, 2013 Conference

Defendants retained new counsel, Michael Resko, shortly before the October 3 conference. (Dkt. #71). The conference itself was attended by all parties and counsel, including both of Defendants' counsel. At the conference, Nesci stated that

> There was an agreement on the record, and the subsequent agreement I got from Ms. Weber exactly tracked the agreement. And in the settlement agreement there was language that both sides would discuss with each other in good faith and attempt to arrange a business relationship, and that discussion, as I understand it, was not fruitful.

7

(Oct. 3 Tr. 3).  When asked by the Court whether the agreed-upon settlement term was that the parties *reach an agreement* regarding their future business relationship, or merely that they *discuss the possibility* of a future business relationship, Nesci answered, "[t]he best I can put it, it was a suggestion that they talk, because apparently they started getting along together again." (*Id.* at 4).  Nesci stated that the agreement was not signed because "Mr. Issa, for one reason for another, doesn't understand that he does not have to do business with the Marinos.  He has settled the case, and whatever is contained in the settlement stipulation and agreement is it." (*Id.* at 5).

The Court also asked Defendants' incoming attorney, Michael Resko, to speak to this issue.  After admitting that he had not read either the transcript of the oral agreement or the written long-form agreement, Resko stated that Issa had

> expressed to me his dissatisfaction and his concerns regarding the settlement agreement basically … also his understanding of the effect of the settlement agreement would basically result in him no longer being able to maintain his business … and that is why he has not signed the agreement and does not wish to proceed with the settlement agreement.

(Oct. 3 Tr. 5-6).  The Court requested letter briefing regarding Plaintiff's anticipated motion to enforce the settlement agreement by October 30, 2013, and set a conference for November 1, 2013.

### 2.    The November 1, 2013 Conference

The parties submitted letter briefing in connection with Plaintiff's anticipated motion to enforce (Dkt. #76, 79), and the Court held oral argument on the anticipated motion on November 1, 2013.

8

At the conference, Plaintiff's counsel again argued that the agreement had two parts: the legal component, which resolved the issues in the case (including the withdrawal of Plaintiff's claims for damages), and the business component, which related to the parties' optional, ongoing business relationship. (Nov. 1 Tr. 3). Stated simply, the former was finalized in the agreement, while the latter was deliberately left open. Plaintiff's counsel stated that the parties had disagreed on the amount to be paid to Issa per student per course. The range was between $65-85. Plaintiff represented that it stood ready to honor that agreement, and to pay Issa the higher amount of $85 per student per course. (*Id.* at 4-5).

Michael Resko, now sole counsel for Defendants, also characterized the agreement as being in two parts: first, the agreement not to compete (which Resko described as the "give" by Issa), and second, an agreed-upon future business relationship (which Resko described as the "get"). (Nov. 1 Tr. 10). In response to the Court's questioning, Resko conceded that the "get" was also the discontinuance of the lawsuit. (*Id.*). The Court then asked Resko whether, if instead of calling a court reporter on August 14, 2013, the parties had called a typist and had signed the agreement that day, he would still argue that it was unenforceable. (*Id.* at 12-13). Resko replied, "I think that there may be a stronger argument for an enforceable agreement." (*Id.* at 13).

On November 5, 2013, Plaintiff moved to enforce the settlement agreement (Dkt. #81), and on November 11, 2013, Defendant submitted the

9

Issa Affidavit in opposition to the motion (Dkt. #83).  The Court now considers Plaintiff's motion.

## DISCUSSION

**A.     Applicable Law**

Under New York law, parties may enter into binding oral settlement agreements, so long as the parties intended to be bound.  *Winston* v. *Mediafare Entm't Corp.*, 777 F.2d 78, 80 (2d Cir. 1985).  This is true even if the parties contemplate memorializing their agreement in a fully executed document.  *R.G. Group, Inc.* v. *Horn & Hardart Co.*, 751 F.2d 69, 74 (2d Cir. 1984).

In *Winston*, the Second Circuit outlined four factors for courts to consider when enforcing an oral agreement:

> (1) whether there has been an express reservation of the right not to be bound in the absence of a writing; (2) whether there has been partial performance of the contract; (3) whether all of the terms of the alleged contract have been agreed upon; and (4) whether the agreement at issue is the type of contract that is usually committed to writing.

777 F.2d at 80-81.  "No single factor is decisive, but each provides significant guidance."  *Ciaramella* v. *Reader's Digest Ass'n, Inc.*, 131 F.3d 320, 323 (2d Cir. 1997) (citing *R.G. Group, Inc.*, 751 F.2d at 74-75).

Moreover, because the issue is one of the putative contract's existence, and not the interpretation of its terms, restrictions such as the parol evidence rule are not implicated.  Instead, the *Winston* factors may be shown by "oral testimony or by correspondence or other preliminary or partially complete writings."  *Winston*, 777 F.2d at 81 (quoting RESTATEMENT (SECOND) OF CONTRACTS § 27 comment c (1981)); *see also Hanna* v. *Motiva Enterprises, LLC*,

10

839 F. Supp. 2d 654, 667 (S.D.N.Y. 2012), *reconsideration denied*, No. 09 Civ. 1150 (VB), 2012 WL 1868962 (S.D.N.Y. Apr. 25, 2012) (rejecting argument that proof of the parties' intent to enter into a contract was barred by the parol evidence rule).

**B.    Application**

All four *Winston* factors, in addition to the express statements of the parties, indicate that they intended to be bound by the agreement reached on August 14, 2013.

    **1.    Was There an Express Reservation of Rights?**

The first *Winston* factor is whether the parties expressly reserved the right not to be bound. *Winston*, 777 F.2d at 80. Neither party did. Quite the opposite, the parties expressly stated "the intention of the parties that all of the material terms of the agreement as set forth as we go on will be subject to a written long-form agreement, but based on the material terms as agreed to today." (Aug. 14 Tr. 4). "[T]he mere fact that the parties contemplate memorializing their agreement in a formal document does not prevent their informal agreement from taking effect prior to that event." *V'Soske* v. *Barwick*, 404 F.2d 495, 499 (2d Cir. 1968) (citations omitted). The first *Winston* factor weighs in favor of enforcement.

    **2.    Was There Partial Performance?**

There was significant performance of the agreement. On August 14, 2013, the parties agreed that (i) they would execute a stipulation of discontinuance and submit it to the Court; (ii) they would draft and execute a

11

long-form agreement within ten days; and (iii) Marino representatives and Issa would discuss their ongoing business relationship (in particular, the commission arrangement and the arrangements for the previously-scheduled Issa CLEs). Both parties initiated performance on each of these terms. Within the ensuing month, Plaintiff's counsel drafted a stipulation of discontinuance, which was signed and returned by Defendants' counsel. Plaintiff's counsel then drafted the Long-Form Agreement on August 26, 2013; she sent it to Defendants' counsel on September 9, 2013, and he forwarded it to his clients shortly thereafter. Lastly, Michael Marino and Issa engaged in numerous discussions related to the commission arrangement and the previously-scheduled Issa CLEs between August 14, 2013, and September 6, 2013.

Each of these elements constitutes partial performance. In *Jackson* v. *New York City Dep't of Educ.*, No. 10 Civ. 9193 (DLC), 2012 WL 1986593, at *3 (S.D.N.Y. June 4, 2012), the court found that there had been partial performance where the parties had prepared and drafted settlement documents, and "most significantly, communicated the settlement to the Court." *See also United States* v. *U.S. Currency in the Sum of Six Hundred Sixty Thousand, Two Hundred Dollars ($660,200.00), More or Less*, 423 F. Supp. 2d 14, 28-29 (E.D.N.Y. 2006) (enforcing oral agreement and unexecuted long-form agreement, and finding partial performance where drafting of the settlement agreement was an agreed-upon term).[4] Here, the parties not only drafted and

---

[4]    The exchange of settlement drafts was not considered partial performance in at least two cases in this district, but they are factually inapposite. In *Langreich* v. *Gruenbaum*, 775 F. Supp. 2d 630, 636 (S.D.N.Y. 2011), the court found that exchange of settlement agreement drafts did not constitute partial performance, where the agreement was

exchanged a long-form settlement agreements that "exactly tracked" the oral agreement, but also jointly represented to the Court that they had settled the case. The second *Winston* factor also weighs in favor of enforcement.[5]

### 3. Were All Key Terms Negotiated?

"A third factor is whether there was literally nothing left to negotiate or settle, so that all that remained to be done was to sign what had already been fully agreed to." *R.G. Group*, 751 F.2d at 76 (citing *Municipal Consultants & Publishers, Inc.* v. *Town of Ramapo*, 47 N.Y.2d 144 (1979)). To be sure,

> even "minor" or "technical" modifications to a settlement agreement may indicate that the parties did not intend to be bound prior to these modifications. *Winston*, 777 F.2d at 82. On the other hand, such changes are relevant only if they show that "there were points remaining to be negotiated such that the parties would not wish to be bound until they synthesized a writing satisfactory to

---

submitted more than a month after the oral agreement, and the parties continued to negotiate the terms thereafter. Similarly, the court in *Lyman* v. *New York & Presbyterian Hosp.*, No. 11 Civ. 3889 (AJN) (JCF), 2012 WL 6135354, at *7-8 (S.D.N.Y. Dec. 11, 2012), *report and recommendation adopted sub nom. Lyman* v. *New York Presbyterian Hosp.*, No. 11 Civ. 3889 (AJN) (JCF), 2013 WL 427178 (S.D.N.Y. Feb. 1, 2013) held that exchange of draft settlement agreements did not constitute partial performance, where the drafting itself was not an agreed-upon term of the oral agreement. Here, the drafting of the settlement agreement, although in a shorter time frame, was an agreed-upon term. Moreover, there is no evidence that the parties continued to negotiate any terms of the agreement after the draft was exchanged. Indeed, the absence of counsel at the business meetings between Issa and Michael Marino evidences the parties' belief that the terms of the settlement agreement (as distinguished from the terms of any future business dealings between the parties) had been fully worked out. Lastly, the parties' joint representation to the Court that they had settled underscores their belief that they had actually settled the case. *See Jackson*, 2012 WL 1986593, at *3.

5   As noted, Issa contends that his post-August 14 discussions with Michael Marino concerning CLE programs at Hunter College caused him to believe that Plaintiff was not "acting and negotiating in good faith." (Issa Aff. ¶ 6). Even accepting those allegations as true for purposes of this motion, they demonstrate, at most, a breach of the agreement by Plaintiff, and not the absence of an agreement in the first instance. Similarly, the reasons proffered by Defendants' new counsel at the October 3 conference for Issa's refusal to sign the Long-Form Agreement — which boil down to "dissatisfaction" (Oct. 3 Tr. 5) about the terms of the agreement and concerns about the future of Issa's business — indicate that Defendants acknowledge the existence of the agreement, but are simply experiencing "buyer's remorse" about its terms.

13

both sides in every respect." *Powell* v. *Omnicom*, 497 F.3d 124, 130 (2d Cir. 2007).

*Jackson*, 2012 WL 1986593, at *3.

The oral agreement recited "the intention of the parties that all of the material terms of the agreement as set forth as we go on will be subject to a written long-form agreement, but based on the material terms as agreed to today." (Aug. 14 Tr. 4). Defendants, by their new counsel, argue that the August 14 oral agreement was not intended to be a full and final expression of the settlement terms, since it left open two items for further discussion between the parties: (i) the commission arrangement; and (ii) arrangements for the previously-scheduled Bridge the Gap CLEs set for the fall of 2013. (Def. Oct. 29 Letter).[6] Defendants further argue that the language used in the oral agreement was conditional because it contained the words "*we are going to come to terms* as to the sharing of revenue" and "it is the intention of the parties *to work out an agreement* whereby those Issa courses will either be combined with Marino, or cross-sold." (*Id.* (emphases added)).

In considering whether the key terms of an agreement were fully negotiated, the Court must consider the text of that agreement, and it has here. Contrary to Defendants' current arguments, however, the Court must also consider the representations of the parties — here, the very counsel who were present at and participated in the negotiation of the settlement agreement

---

[6]   The oral and written agreements "carved out" the previously-scheduled CLE programs in the fall of 2013 from the non-compete arrangement. Thus, even if Issa were to conduct these CLEs, he would not breach the agreement. (*See* Aug. 14 Tr. 5; Nov. 1 Tr. 5).

on August 14.  Defendants' previous counsel, Vincent Nesci, represented to the Court that the agreed-upon settlement terms meant that the parties "would talk," *not* that they would reach an agreement regarding all aspects of their future, optional business relationship.  (Oct. 3 Tr. 4).[7]  Nesci described the terms of the agreement as: "there was language that both sides would discuss with each other in good faith and attempt to arrange a business relationship." (*Id.* at 3).  Nesci further stated that "Mr. Issa, for one reason for another, doesn't understand that he does not have to do business with the Marinos.  *He has settled the case, and whatever is contained in the settlement stipulation and agreement is it.*"  (*Id.* (emphasis added)).[8]

---

[7] The agreement provided that Issa would discontinue his own CLE programs in New York, New Jersey, and Pennsylvania for the next three years, but that he could exclusively sell Plaintiff's CLEs, which he is alleged to have misappropriated.  Plaintiff states that the parties had agreed to a commission in the amount of $65-85, and stands ready to honor the higher amount in that range.  Defendants argue that their "value" in agreeing to this settlement agreement is the precise amount of commission and business revenues, and thus it is an essential and material term of the agreement. (Def. Oct. 29 Letter).  This is not so: the value to Defendants was that this lawsuit would be discontinued without any admission of wrongdoing.  (*See* Long-Form Agreement).  In this context, the "optional" business relationship appears to be just that — optional.  Issa could choose *not* to sell Marino's CLE programs for the next three years; the language of the agreement provides for both that possibility, and the possibility that Issa would sell Marino's CLE programs.  Thus, the commission and previously-scheduled CLE arrangements were not left open; they simply provided that the parties would discuss the range of possibilities on an ongoing basis.

[8] As in *Jackson*, 2012 WL 1986593, at *3, "there is no evidence of any disagreement among the parties on the terms of the contract during the drafting period until the [contesting party] retained new counsel."  Defendants' new counsel has not offered any reason to disbelieve prior counsel, or to believe that prior counsel's legal representation was anything less than competent.  Nor are there any allegations that Issa — who was present as the settlement agreement was taken down by the reporter — raised issues with the settlement at the time it was entered into, or was cajoled, forced, or duped into the agreement by any party.

Nesci negotiated the agreement on behalf of Defendants, and understood there to be no terms left open for negotiation.[9] Plaintiff's counsel agrees, and argues that the parties' future business relationship was not a material term of the agreement, but instead was "completely Mr. Issa's choice." (Pl. Oct. 15 letter).

Clearly, the parties' continued discussions were an agreed-upon term of the contract, not the fruits (or lack thereof) of the parties' discussions. *See Vacold LLC* v. *Cerami*, 545 F.3d 114, 129 (2d Cir. 2008) (finding "no evidence from which we could conclude that the parties left material terms of their agreement open to further negotiation" (citation omitted)); *Wesley* v. *Corr. Officer Badge No. 9417*, No. 05 Civ. 5912 (HB), 2008 WL 41129, at *3 (S.D.N.Y. Jan. 2, 2008) (where the "parties had agreed to all the material terms of the settlement during the teleconference with the Court," the second *Winston* prong was satisfied, and the oral agreement was found to be binding).

In *Ciaramella* v. *Reader's Digest Ass'n, Inc.*, the Second Circuit found that the parties had not agreed on all material terms where the draft settlement agreement contained a new provision not agreed to orally, the addition of which

---

9   Contemporaneous e-mails between the parties' counsel confirm the parties' understanding that the business arrangement was not open to further negotiations before the agreement was finalized.  On September 16, 2013, Nesci wrote "as the last I heard [Michael Marino] and Omar were working on something — exactly what I have no idea." (Weber Decl. Ex. B).  Weber replied "[l]et them worry about that agreement …. let's get the settlement signed so we can get the Stipulation filed." (Weber Decl. Ex. C).  Nesci wrote Weber the next day to advise that he "told [Issa] that he and Michael [Marino] must sign now and that *the business deals can be done as they come up.*" (Weber Decl. Ex. F (emphasis added)).  All of this, of course, is consistent with the representations of the parties in the August 5 letter to the Court that they were "continu[ing] settlement discussions and believe[d] an amicable resolution can be reached." (Dkt. #67 at 5).

16

caused the plaintiff to refuse to sign the settlement agreement. 131 F.3d at 325. By contrast, in the instant case, the draft settlement agreement "exactly tracked" the oral agreement.[10] Quite notably, the Long-Form Agreement provided for further discussions on the exact two issues as in the oral agreement. This fact corroborates counsels' representations to the Court that the parties never intended to finalize these two tangential issues in their settlement agreement: they only intended that the parties agree to talk about them. An issue cannot be "open" if the parties never intended it to be such.

Lastly, it bears noting that Plaintiff brought claims of trade secret misappropriation and trademark infringement, among other claims, related to Defendants' alleged misappropriation of Plaintiff's client lists and CLE program. The settlement agreement, in both oral and written form, resolves these issues, and spares Defendants the possibility of a judgment in excess of several hundred thousand dollars. The "open" issues related to the parties' *optional* ongoing business relationship. This understanding was conveyed by the lawyers who negotiated the agreement, including Defendants' counsel. Given

---

[10] Among other things, the Long-Form Agreement contained the following terms:

> In New York, New Jersey and in Pennsylvania the Issa Defendants and Plaintiff shall negotiate and execute a commission agreement as soon as practicable.
>
> * * *
>
> It is the intention of the Parties to work out an agreement whereby those Issa Defendants' courses will either be combined with Plaintiff's courses, or cross-sold, and that those dates are not a breach of the exclusivity provision.

(Long-Form Agreement).

17

these circumstances, the Court finds that the agreement did not contain open issues. The third *Winston* factor weighs in favor of enforcement.

### 4. Is the Agreement of the Type Memorialized in Writing?

"Settlements of any claim are generally required to be in writing or, at a minimum, made on the record in open court." *Ciaramella*, 131 F.3d at 326 (citing N.Y. C.P.L.R. § 2104). Section 2104, which is New York's oral settlement statute, requires that oral settlements be made in open court "in order to ensure accuracy, as a limited exception to the statute of frauds." *Pretzel Time, Inc.* v. *Pretzel Int'l, Inc.*, No. 98 Civ. 1544 (RWS), 2000 WL 1510077, at *5 (S.D.N.Y. Oct. 10, 2000) (citing *Jacobs* v. *Jacobs*, 229 A.D.2d 712, 715 (N.Y. App. Div. 1996) ("if there is an open court stipulation with all the authenticity it carries based on a supporting transcript, then the Statute of Frauds is not applicable.... It is the formality of the open-court proceeding and the authenticity provided by the transcript which are relevant to the Statute of Frauds issue....")).

The presence of a court reporter satisfies the "open court" requirement. *See Penn Columbia Corp.* v. *Cemco Resources, Inc.*, No. 88 Civ. 0667 (SWK), 1990 WL 6555, at *4 (S.D.N.Y. Jan. 22, 1990) (settlement agreement reached at a deposition on the record before a court reporter); *see also Pretzel Time*, 2000 WL 1510077, at *5 (following a settlement negotiation, the parties read their agreement into the record before a court reporter).[11]

---

[11] Defendants argue that this agreement does not satisfy the "open court" prong because it was not reached at a deposition. (Def. Oct. 29 Letter). However, courts have found the presence of a court reporter alone to satisfy the "open court" requirement. *See Pretzel Time*, 2000 WL 151077, at *5. As further indication of their intention to confer the

In the instant case, the parties not only reached a settlement agreement, but went a step further by calling a court reporter to read their agreement into the record. This indicates an intention to be bound and to confer upon the agreement the requisite amount of formality and enforceability.

In sum, all of the *Winston* factors weigh in favor of enforcing the oral agreement that was reached on August 14, 2013, and reduced to writing shortly thereafter.

## CONCLUSION

For the reasons discussed in this Opinion, the motion to enforce the settlement agreement is GRANTED. The Clerk of Court is directed to terminate Docket Entry 81 and to close the case.

Dated: December 20, 2013
New York, New York

_____
KATHERINE POLK FAILLA
United States District Judge

---

requisite formality on the agreement, the parties began their oral agreement transcription on August 14 by stating "we are on the record." (Aug. 14 Tr. 3).